IN THE DISTRICT COURT IN KAY COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| MICHAEL McKINNEY, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. CJ-2019-231 ) |
| COMMUNITY HEALTH SYSTEMS, INC.; CLINTON HMA, LLC; DURANT HMA, LLC; MARSHALL COUNTY HMA, LLC; MIDWEST REGIONAL MEDICAL CENTER, LLC; KAY COUNTY OKLAHOMA HOSPITAL COMPANY, LLC; SEMINOLE HMA, LLC; WOODWARD HEALTH SYSTEM, LLC; | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## PLAINTIFF'S SECOND AMENDED PETITION

The Plaintiff Michael McKinney on behalf of himself and all others similarly situated state the following as his cause of action against the Defendants:

PARTIES TO THE LITIGATION AND JURISDICTION OF THIS COURT

1. Michael McKinney is a resident of Kay County, Oklahoma.

2. Community Health Systems, Inc., (CHS) is a publicly traded hospital conglomerate. CHS is a foreign corporation that owns and operates the remaining hospital Defendants in this case.

3. Defendant Clinton HMA, LLC, is an Oklahoma limited liability company that operates under the name AllianceHealth Clinton. Defendant Durant HMA, LLC, is an

EXHIBIT 6
Page 1 of 12

Oklahoma limited liability company that operates under the name AllianceHealth Durant. Oklahoma Corporation. Defendant Marshall County HMA, LLC, is an Oklahoma limited liability company that operates under the name AllianceHealth Madill. Defendant Midwest Regional Medical Center, LLC, is an Oklahoma limited liability company that operates under the name of AllianceHealth Midwest. Defendant Kay County Oklahoma Hospital Company, LLC, is an Oklahoma limited liability company that operates under the name AllianceHealth Ponca City. Defendant Seminole HMA, LLC, is an Oklahoma limited liability company that operates under the name AllianceHealth Seminole. Defendant Woodward Health System, LLC, is an Oklahoma limited liability company that operates under the name AllianceHealth Woodward (Collectively referred to as "Alliance" or "Hospital Defendants").

4. CHS operates and sets the billing policy for all the Hospital Defendants. CHS operates AllianceHealth Clinton, located in Clinton, Oklahoma; AllianceHealth Durant, located in Durant, Oklahoma; AllianceHelath Madill, located in Madill, Oklahoma; AllianceHealth Midwest, located in Midwest City, Oklahoma; AllianceHealth Ponca City, located in Ponca City, Oklahoma; AllianceHealth Seminole, located in Seminole, Oklahoma; and AllianceHealth Woodward, located in Woodward, Oklahoma. All the Alliance facilities operate under common control and common billing practices established by CHS.

5. Venue is proper in this Court because the lien at issue was filed in Kay County and the facts giving rise to this lawsuit occurred in Kay County, Oklahoma.

## CHS' CORPORATE STRUCTURE

6.     CHS describes itself as, "one of the largest publicly-traded hospital companies in the United States and a leading operator of general acute care hospitals and outpatient facilities in communities across the country." *United States Securities and Exchange Commission 2019 Form 10-K for Community Health Systems, Inc.*

7.     CHS currently operates 102 hospitals with a combined total 16,240 beds. CHS' hospitals are spread over eighteen (18) states. CHS operates seven (7) hospitals in Oklahoma with a combined total of approximately 750 beds. CHS employs 2,000 physicians and 1,000 licensed healthcare practitioners across the Country. *Id.*

8.     CHS advertises to its stockholders that it achieves maximum profitability by centralized, uniform management practices:

> Our hospital management teams are supported by experienced corporate leaders who have significant industry knowledge and a proven track record of success. Local hospitals benefit from centralized clinical, operational, financial and regulatory expertise that encompasses nearly every aspect of our business. Additionally, we are able to leverage deep and meaningful data sources to facilitate informed decision-making and drive operations improvements across the enterprise in areas such as drug and supply procurement, workforce optimization and staffing and emergency department and operating room performance.
>
> Standard policies and procedures in areas ranging from physician practice management to patient accounting to construction and facilities management help to facilitate best practices, reduce variation and improve operating results.

*Id.*

9.     CHS' standardized procedures are evident in its billing and collection practices. CHS implements standardized billing and collection practices at all of its hospitals:

> *Billing and Collections.* We have adopted standard policies and procedures with respect to billing and collections. We have automated various components of the collection cycle, including statements and collection letters, to help facilitate timely and accurate progression of our accounts through the collection cycle. We have consolidated local billing

3

EXHIBIT 6
Page 3 of 12

and collection functions into six centralized business offices and have completed the transition of our hospital billing departments to this new infrastructure. We are now realizing the benefits of lower patient claim denials, higher underpayment recoveries and reduce operating expenses.

*Id.* (emphasis supplied).

## DEFENDANTS' PREFERRED PROVIDER AGREEMENTS WITH HEALTH INSURANCE COMPANIES

10. Hospitals routinely enter into agreements with health insurance companies to benefit insured patients and increase the hospital's profits. These agreements are commonly referred to as preferred provider agreements.

11. Under the terms of a preferred provider agreement, the hospital negotiates with the health insurer payment rates for its services provided by the hospital to insured patients. After the hospital has successfully negotiated how much the health insurer will pay for treating insured patients, the hospital further agrees that payment by the health insurer at the negotiated rate will be accepted as full payment. The hospital agrees to hold the patient harmless for any amounts above the negotiated rate.

12. Preferred provider agreements benefit hospitals because they provide tremendous stability to a hospital. The hospital is guaranteed that when it treats an insured patient it will be promptly paid at a rate it has agreed to accept. Furthermore, the hospital is able to advertise itself as a preferred provider of the health insurer. As a preferred provider, the hospital gains access to a larger population of patients than if it were an "out of network" facility. Patients seek treatment at preferred provider facilities.

13. Preferred provider negotiated rates are always less than the hospital's full charge. Nonetheless, hospitals agree to accept less than their full charge to get the benefits of being a preferred provider.

4

EXHIBIT 6
Page 4 of 12

14. Preferred provider agreements also benefit patients. Patients seek treatment at preferred provider facilities because they are promised that their medical bills will be paid by their health insurer and that they will have no financial responsibility. Patients pay their health insurance premium for this peace of mind.

## CHS AND ALLIANCE'S UNDISCLOSED BILLING POLICY

15. As explained above, CHS promotes its uniform, standardized billing practices.

16. One such policy is its undisclosed policy regarding how it bills patients involved in accidents cause by the negligence of a third party.

17. In the event a patient who is covered by health insurance is injured in an accident caused by a third party, CHS and Alliance do not submit the patient's medical bills to the patient's health insurer.

18. CHS and Alliance are keenly aware that if the patient's bill is submitted to the patient's health insurer they will be forced to accept the preferred provider rate which is less than their full charge.

19. Instead of submitting the patient's bill to the patient's health insurer and being required to accept the lower preferred provider rate as full payment, CHS and Alliance have an undisclosed policy of filing liens against the patient's injured by the negligence of a third party.

20. CHS and Alliance make more money by filing a lien. CHS and Alliance's policy is to ignore a patient's health insurance and file a lien against the patient for 100% of CHS and Alliance's normal charges, not the lower preferred provider rate.

21. CHS and Alliance's billing policy causes great harm to its patients. Patients pay their health insurance premium to avoid the financial harm that comes with being

5

EXHIBIT 6
Page 5 of 12

uninsured. CHS and Alliance deprive patients the benefits of having health insurance by refusing to submit the patient's bill for payment. The patient is left uninsured due to Defendants' conduct.

22. Defendants' billing policy is mandated by CHS. CHS requires all its hospitals to follow the same standardized, uniform billing policies. CHS has full control over the billing policies implemented by the Hospital Defendants.

## CHS' STANDARDIZED, WRONGFUL BILLING PRACTICES HAVE LED TO IT BEING SUED IN A HOST OF CLASS ACTIONS IN MULTIPLE STATES

23. The uniformity of CHS' billing policies is evidenced by the host of class actions filed against it.

24. CHS has been sued three separate times for wrongfully refusing to submit a patient's bill to the patient's health insurance company.

25. The first lawsuit was file in in Arkansas more than four (4) years before Defendants filed a lien against McKinney.

26. Jessica Mounce sued CHS owned hospital Northwest Arkansas Hospitals, LLC, on behalf of all Arkansas residents who had been subjected to the same billing practices as McKinney.

27. Ms. Mounce's lawsuit continued until it was approved for preliminary settlement on May 28, 2018. Under the terms of the settlement, the defendants agreed to pay $2,234,829.00 to all patients the had wrongly filed liens against. *See Jessica Mounce, individually and on behalf of all other similarly situated plaintiffs v. CHSPSC, LLC; Northwest Arkansas Hospitals, LLC, Case No. 15:cv-5197 TLB,* August 31, 2018, Motion for Final Approval of Class Action Settlement, United States District Court Western District of Arkansas, Fayetteville Division.

28. CHS was again sued for wrongfully filing liens against insured patients in *Gibson v. National Healthcare of Leesville, Inc., d/b/a Byrd regional Medical Center*, this case is filed in Louisiana. *United States Securities and Exchange Commission 2019 Form 10-K for Community Health Systems, Inc.*

29. In the *Gibson* case, CHS denied any wrongdoing. The Court disagreed. The *Gibson* Court certified a statewide class action and denied CHS' motion for summary judgement. CHS appealed both rulings, CHS' appeal was denied. On October 24, 2019, the Court approved notice to the class. *Id.*

30. CHS' billing policy again came under scrutiny in *Bowden v. Ruston Louisiana Hospital Company, LLC*. *Bowden* was also a class action filed in Louisiana. Plaintiff's motion for class certification is currently pending. *Id.*

31. CHS simply does not stop enforcing a billing policy that is clearly against the law and harmful to its patients. Indeed, just six (6) days after ordering a lien be filed against McKinney, CHS agreed to pay over $2,200,000.00 to the citizens of Arkansas – for doing the exact same thing.

32. The uniformity of CHS' billing policy is strongly and disturbingly reflected by these lawsuits. CHS has been told, multiple times by multiple courts, that its billing policy is harmful to its patients. Despite these court orders, CHS stubbornly continues to mandate the policy.

## MICHAEL McKINNEY'S CAR ACCIDENT AND TREATMENT AT ALLIANCEHEALTH PONCA CITY

33. On September 27, 2018, Plaintiff was involved in a car accident that was caused by the negligence of another driver.

34  Plaintiff suffered severe injuries to his head, chest, and shoulder.

35. Plaintiff sought emergency treatment at AllianceHealth Ponca City. Alliance advertises itself as a preferred provider facility that accepts most major health insurance plans. On its website, Alliance makes many representations that the patient receives the benefit of having paid for health insurance by doing all the hospital can do to submit the patient's bills to the appropriate health insurance company:

> When you receive a bill from us, it covers services you received at one of our healthcare facilities. As a courtesy to our patients, we will bill your insurance company, Medicare or Medicaid on your behalf. We will do everything possible to obtain payment and expedite your claim.
> \*\*\*
> We accept most major health insurance plans and managed care programs.
> \*\*\*
> We accept most insurance available in our community, including Medicare and Medicaid...Generally, the amount you pay will be less if your hospital and physicians are in-network with your health plan.

*www.myalliancehealth.com*.

36. At the time Plaintiff was injured and received his treatment, Alliance was a preferred provider of Plaintiff's health insurance company.

37. Despite being a preferred provider and holding itself out to the public as a preferred provider facility interested in reducing the financial hardship of its patients, Alliance did not submit Plaintiff's medical bills to his health insurance company.

38. Plaintiff was only at Alliance for one day. Alliance's charges for one day of treatment were $15,948.24. Alliance billed all of these charges to the Plaintiff, Alliance did not submit any of the charges to Plaintiff's health insurer.

39. Instead of submitting the bills to Plaintiff's health insurer, Alliance filed a lien for 100% of its bill against Plaintiff's potential accident recovery. The billing policy Alliance applied against Plaintiff was established by CHS. CHS required Alliance to implement the policy.

## CLASS ACTION ALLEGATIONS

40. Plaintiff brings this lawsuit on behalf of two classes of people. The first class of people includes:

> All people in the State of Oklahoma who, from October 21, 2014, to the present who were/are beneficiaries of an insurance plan from which Defendants had agreed to accept as full payment a reduced fee for services but from whom Alliance demanded and who eventually paid Defendants more than the agreed to reduced fee.

The second class of people includes:

> All people in the State of Oklahoma who, from October 21, 2014, to the present who were/are beneficiaries of an insurance plan from which Defendants agreed to accept as full payment a reduced fee for services but who now Defendant(s) are demanding full payment.

41. This action is brought and may properly be maintained as a class action under Oklahoma Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

42. The exact number of class members is unknown to Plaintiff at this time, but such information can be ascertained through appropriate discovery, specifically from records maintained by the Defendants. Upon information and belief, the number of putative members of the class exceeds 1,000 persons and entities.

43. Defendants' practice of refusing to submit claims for payment under previously agreed to preferred provider rates is a systematic, mechanical practice carried out by Defendant in the same manner against all of the class members.

9

EXHIBIT 6
Page 9 of 12

44. It is believed by the Plaintiff that during the class period Defendants' refusal to submit claims for payment under previously agreed to preferred provider rates has affected many Oklahoma citizens.

45. Common questions of law and fact exist as to all class members and predominate over individual questions affecting solely individual members of the class.

46. The claims asserted by the Plaintiff are typical of the claims of the class members because Defendants have tortiously breached the contract(s) which Plaintiff and the class were third party beneficiaries.

47. The Plaintiff will fairly and adequately represent the interests of the members of the class by prosecuting the action. The Plaintiff is unaware of any potential conflicts that prevent him from serving as the class representative.

48. If a class is not certified, the prosecution of hundreds of different actions by individuals would create substantial risk of inconsistent judgments. Further, the prosecutions of hundreds of separate actions is uneconomical for the class and the Courts.

49. For the reasons set forth above, the class action device is superior to other available methods for prosecuting this case.

## CLAIMS FOR RELIEF

50. Plaintiff incorporates all the above statements by reference.

51. Defendants' billing practice of refusing to accept previously agreed to preferred provider rates is a deceptive and unfair trade practice that inflicts substantial injury upon Plaintiff and the rest of the class.

52. Defendants' billing practice violates Oklahoma's Consumer Protection Act.

53. Plaintiff and all class members are third party beneficiaries to the preferred provider agreements between Defendants and the various health insurance companies.

54. Defendants' billing practice of refusing to accept previously agreed to preferred provider rates constitutes a breach of the insurance contract(s) designed for the benefit of the Plaintiff and the class.

55. Defendants' repeated practice of refusing to accept previously agreed to preferred provider rates, when fully aware they have contractually agreed to do so, constitutes a deliberate and tortuous breach of contract.

56. The Hospital Defendants' conduct forms a significant basis for Plaintiffs' claims. CHS mandated the billing policy and the Hospital Defendants acted as the agents of CHS and carried out the wrongful policy.

57. As a result of Defendants' conduct impacting the first class of Plaintiffs, the first class of Plaintiffs seek damages in excess of $75,000.00 in actual damages.

58. The second class of Plaintiffs seek injunctive relief of enjoining the Defendants from continuing to demand more than the previously agreed to preferred provider rates.

59. Plaintiffs and the class seek punitive damages in excess of $75,000.00.

Wherefore, Plaintiff on behalf of himself and all other similarly situated seek judgment against the Defendants for actual and punitive damages in excess of $75,000.00.

Respectfully submitted,

_____
Paige Lee, OBA #16860
Lee Law
520 S. Knoblock

Stillwater, OK 74074
405-742-7452 Phone
405-338-1619 Fax
paige@paigeleelaw.com

and

Bradford D. Barron, OBA #17571
The Barron Law Firm, PLLC
PO Box 369
Claremore, OK 74018
918-341-8402 Phone
918-515-4691 Fax
bbarron@barronlawfirmok.com

## CERTIFICATE OF MAILING

I certify that on __3/23/20__ a copy of this document was mailed to the following:

John D. Russell
Andrew J. Hofland
Justin A. Lollman
GableGotwals
1100 OneOK Plaza
100 West 5ht Street
Tulsa, OK 74103-4217

_____
Bradford D. Barron